## Wells v. Shadoin, et al.

(Decided March 21, 1924.)

### Appeal from Magoffin Circuit Court.

1. Mines and Minerals—Rentals May be Paid in Advance of Time Designated.—Although oil and gas lease designated quarterly payments of rentals in advance, it did not restrict lessee from including all rentals in a smaller number of advance payments, and where excess payment was made by mistake and in good faith, it should be credited as an advance payment on subsequent rentals and fulfilled the conditions of the lease.

2. Mines and Minerals—Bona Fide Purchaser Stands on High Plane in Equity.—A bona fide purchaser of an oil and gas lease for a valuable consideration without notice stands on a high plane in a court of equity.

3. Mines and Minerals—Purchaser of Lease Held to have Notice of Rights of Lessee Under Prior Lease.—Purchaser of oil and gas lease held put on inquiry and charged with notice of the rights of the lessees under a prior lease, who had ceased to pay rentals because of previous over-payments and not a bona fide purchaser without notice, but amenable to the same legal remedies as might be invoked against his assignors.

HAZELRIGG & HAZELRIGG and H. H. RAMEY for appellant.

J. B. ADAMSON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

On June 17, 1917, Mary Adams executed to E. L. Stephens a ten-year oil lease on a tract of land in Magoffin county, describing it as being bounded "on the north by the lands of Kelly Adams; south by the lands of A. H. Caudill; east by lands of Kelly Adams; north by the lands of A. H. Caudill, containing 175 acres."

The recited consideration was "$7.50 in hand paid and of the covenants, agreements, rents and royalties hereinafter mentioned. . . . Second party agrees to sink a test well upon the above described property within one year and also agrees to commence operation in the county inside of eight months or as soon as practicable. This lease to become void if well is not completed within said time unless said parties shall pay as rentals for said premises at the rate of 25c per acre annually, payable every three months in advance during the time drilling is delayed."

This lease was duly recorded and on July 12, 1917, was assigned by Stephens to Shadoin and Holbrook; later Holbrook assigned his share to Shadoin, Grover and Porter. No wells were drilled on the property, but beginning on the 3rd of June, 1918, the rentals were paid in advance up to and including December 7, 1919, making a total of $76.58.

At the time the lease was executed the territory was "wild cat," but during the year 1919 wells were drilled in the vicinity and the lease became valuable. Shadoin received information that there was a shortage in the acreage of this lease and did not pay the quarterly rental of $10.94 in advance on March 7, 1920. Shadoin lived in Lexington and had no knowledge of the property except from the description of the lease.

In the month of May he sent Mr. Holbrook, with whom he had negotiated the lease to Magoffin, to investigate and to arrange the matter with Mrs. Adams. It developed that there were only 6½ acres in the lease and that Shadoin had already paid in advance far in excess of the amount of rentals that could accrue on that acreage during the entire ten-year period, and Holbrook informed Mrs. Adams of that fact.

In the meantime T. J. Arnett, a lawyer of Salyersville, had learned that the March rentals had not been paid and had secured from Mrs. Adams an affidavit to that effect, and on his assurance that the Stephens lease was void she had on May 7, 1920, executed a top lease to him in the names of H. H. Ramey and J. F. Borders for the same boundary for a small bonus and a yearly rental of $1.25 per acre, on the basis of 40 acres, though he knew there were less than 10 acres in the boundary.

Holbrook returned by the way of Salyersville and saw Arnett, who tried to sell him the top lease, but Hol-

brook declined this, telling him the Shadoin lease was valid. Later Arnett negotiated the top lease with J. K. Wells, of Ashland, and it was conveyed to him by Ramey and Borders on June 5, 1920, for the sum of $600.00. Shadoin and his partners sued Wells, Ramey, Borders and Mrs. Adams, seeking a cancellation of the top lease and the assignment; to have plaintiffs' title in the property covered by the original lease quieted and to enjoin defendants from interfering with the use and enjoyment thereof. The court granted the relief sought and J. K. Wells has appealed.

The contract clearly shows that the rentals were estimated by the acre and not in gross. The language in this respect was so clear and unmistakable as to be beyond cavil. It is further clear that the rentals were paid in advance on that basis and that the amount so paid would have covered the agreed rentals on the actual number of acres in the boundary for a period of 46 years.

For the time being, considering the question without reference to the top lease, it is patent that as between the parties to the original lease relief could be secured from such gross mistake.

Although the contract designates quarterly payments in advance there is nothing in it restricting the lessee from including all rentals in a smaller number of advance payments, and under such circumstances where excess payment is made by mistake and in good faith as an advance rental there is no good reason why it should not be so credited, and where so credited the conditions of the lease are fulfilled and there is no forfeiture.

True different remedies might be sought, but the plaintiffs had their election in that matter and if the one chosen is permissible their adversary may not complain, hence between plaintiffs and Mary Adams there can be no question as to the correctness of the judgment.

It is urged by appellant that as against third parties, in order to secure the relief sought, the appellees should have brought suit for a reformation of the lease before ceasing to pay rentals thereon; that their action and conduct in continuing to pay quarterly rentals on 175 acres for a period of twenty-one months, shows that the parties construed their lease to be in gross and not by the acre and caused others to think that they so regarded it; that when they ceased altogether to pay rentals that

such cessation was an abandonment and so regarded by others; that indeed such was the case, and that the present suit is but an afterthought occasioned by the developments of other wells in the vicinity; that acting upon this assumption the appellant paid a substantial consideration for the assignment of the top lease, and should be protected as a *bona fide* purchaser, and appellees' only relief is to recover from Mary Adams the excess of rentals paid.

A *bona fide* purchaser for a valuable consideration without notice stands on a high plane in a court of equity, and if appellant is one of that class there is much force in the above suggestions.

Looking to the facts it appears that appellee had never been in Magoffin county and had no intimation of a deficit of the acreage expressed in the lease until some time in November, 1919. It further appears that there was considerable development in the vicinity of this land in the year 1919 and that such leases had become valuable; that appellees had considered drilling a well on the lease themselves during that year and sent a man to investigate, who reported favorably, but informed them as to the shortage. Shadoin states that he thought possibly some of Mrs. Adams' land had been held by title bond and later sold and he hoped to trace this; at any rate it is not at all probable that they had any intention of abandoning the lease in failing to pay rent in March.

It must be noted that the recorded lease showed the rentals were computed by the acre and the number of acres were specified, and it is admitted that Mr. Adams informed Arnett that the rentals had been paid up to March, 1920, and that Arnett knew there were less than ten acres in the boundary, so that he knew of the amount paid and of the deficit in acreage. Further, as affecting notice to Kelly not only did Holbrook inform Arnett of appellees' claim and refuse outright to negotiate for the top lease, but on May — 1920, Shadoin wrote Arnett, vigorously protesting against his action, and it is shown that all of these matters, except perhaps the conversation with Holbrook, were presented to Kelly before he purchased the lease, and according to Arnett the market value of the lease at the time of the assignment was from $2,000.00 to $2,500.00 and he sold it for $600.00 on account of Shadoin's claim and the prospect of a lawsuit

arising thereon. The letter to Arnett has been lost, and it is denied that in it a claim was made that the lease in question was in force, and Kelly says that he construed the letter as an abandonment of the lease and as asserting a claim for overpaid rentals, or something of that character, but there is in the record an answer to it written by Arnett in which he referred to his contention that the former lease was forfeited for nonpayment of rentals and said:

"I will say to you that it is my intention to hold this lease and pay rental due on same and if you think you have a right to this, then we will try the matter out in the courts."

This answer indicates that Shadoin was asserting a claim under the lease.

But however it may have been construed by Mr. Wells there were certainly enough facts and circumstances brought to his attention to put him on inquiry as to appellees' claim and the slightest investigation would have demonstrated that the prior lease had not been abandoned. This constitutes notice. Everidge v. Martin, 164 Ky. 505; Gates v. Shannon, 200 Ky. 387.

If he took the risk of relying on the information he had rather than to discharge the duty of reasonable inquiry it cannot be said that he is a *bona fide* purchaser without notice, consequently he is amenable in this case to the same legal remedies as may be invoked against his assignors.

It follows that the court did not err in adjudging a cancellation by the lessees.

Wherefore, judgment is affirmed.